# United States Court of Appeals
## For the First Circuit

No. 19-2204

UNITED STATES OF AMERICA,

Appellee,

v.

EMILIANO EMMANUEL FLORES-GONZÁLEZ,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Barron, Chief Judge,
Thompson and Kayatta, Circuit Judges.

---

Ivan Santos-Castaldo, Research and Writing Attorney, with whom Eric Alexander Vos, Federal Public Defender, Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Division, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant.
Gregory B. Conner, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Marina E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

---

May 16, 2022

---

**THOMPSON**, **Circuit Judge**.    Emiliano Emmanuel Flores-González ("Flores") thinks his 48-month prison sentence entered after he pled guilty to illegally possessing a machine gun (a modified Glock pistol) is too long — in legal lingo, he believes his incarcerative term (which is well below the 10-year statutory maximum) is procedurally and substantively unreasonable. Reviewing for abuse of discretion — a multidimensional standard that requires us to inspect fact findings for clear error and legal rulings *de novo* (with fresh eyes, to use plain English), see United States v. Rivera-Berríos, 968 F.3d 130, 133-34 (1st Cir. 2020) — we agree with one of his many arguments and so vacate his sentence and remand for resentencing consistent with this opinion.

## I

Criminal sentencing might be the hardest thing district judges do.  See, e.g., United States v. Vixamar, 679 F.3d 22, 34-35 (1st Cir. 2012).  What was once a system of "total judicial discretion" (letting judges pick whatever sentence they wished, unless Congress reined in that discretion with statutes setting minimum or maximum penalties) and then one of "virtually no[]" discretion "with mandatory [sentencing] guidelines" is now a regime of "advisory guidelines with discretion for variances and policy disagreements with the guidelines" (though judges must

still, of course, stay within statutory bounds).[1]  See Mark W.

Bennett, *Addicted to Incarceration:  A Federal Judge Reveals Shocking Truths About Federal Sentencing and Fleeting Hopes for Reform*, 87 UMKC L. Rev. 3, 22 (2018).[2]  Appellate decisions on the subject fill volumes of the United States Reports and the Federal Reporter series.

Developed by the federal sentencing commission — a non-elected body created by Congress that sits within the judicial branch, see 28 U.S.C. § 991(a); see also id. § 994(a) — the guidelines set up a matrix-like regime.[3]  Roughly speaking, a judge scores the crime's "base offense level," making adjustments for certain aggravating or mitigating factors to get the "total offense level."  See United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2

---

[1] "The allowable band of variance is greater" under the new system than under the old ones, though

> intellectual discipline remains vital.  "[A] motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles."

See United States v. Kirkpatrick, 589 F.3d 414, 416 (7th Cir. 2009) (quoting United States v. Burr, 25 F. Cas. 30, 35 (C.C.D. Va. 1807) (Marshall, C.J.)) (alterations by Kirkpatrick).

[2] Former Judge Bennett was a district judge in the Northern District of Iowa from 1994 to 2019.  See *Biographical Directory of Article III Federal Judges — Bennett, Mark W.*, Federal Judicial Center, https://www.fjc.gov/history/judges/bennett-mark-w.

[3] For more general background on the sentencing commission, see Mistretta v. United States, 488 U.S. 361, 363-70 (1989).

(1st Cir. 2019).  Next the judge scores the defendant's criminal record to get the "criminal history category" (I through VI).  Turning then to the guidelines' sentencing table, the judge marks (with his or her fingers, for example) the total offense level on the table's vertical line and the criminal history category on the horizontal line, id. — "[w]here the judge's finger[s] stop[], he or she finds" the defendant's advisory sentencing range, see Albert W. Alschuler, *The Failure of the Sentencing Guidelines:  A Plea for Less Aggregation*, 58 U. Chi. L. Rev. 901, 907 (1991).  And — as will become relevant — the judge (while still respecting statutory limits) can opt to vary from that range based on reasons tied to a categorical policy disagreement with the guidelines, see Spears v. United States, 555 U.S. 261, 264 (2009) (per curiam) (discussing Kimbrough v. United States, 552 U.S. 85, 109 (2007)); United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009), or to a "case-specific" appraisal of any applicable sentencing factors in 18 U.S.C. § 3553(a), see Rivera-Berríos, 968 F.3d at 136 (quoting United States v. Flores-Machicote, 706 F.3d 16, 23 (1st Cir. 2013)).[4]

---

[4] So although advisory, the guidelines remain the "lodestone" of federal sentencing.  See Peugh v. United States, 569 U.S. 530, 541-44 (2013).

Staying with the § 3553(a) factors, we point out (if you will forgive a longish quote) that "[t]here are seven" of them:

> Factor one is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Factor two is
>
>> the need for the sentence . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
>
> Id. § 3553(a)(2). Factor three is "the kinds of sentences available." Id. § 3553(a)(3). Factor four is the guidelines. Id. § 3553(a)(4). Factor five is "any pertinent policy statement . . . issued by the [s]entencing [c]ommission." Id. § 3553(a)(5). Factor six is "the need to avoid unwarranted sentence disparities." Id. § 3553(a)(6). And factor seven is "the need to provide restitution to any victims." Id. § 3553(a)(7).

United States v. Correa-Osorio, 784 F.3d 11, 28 n.24 (1st Cir. 2015).[5] After picking a sentence, the judge must adequately

---

[5] The judge can also make departures: unlike variances — which, as we have just seen, result from a judge's assessment of the § 3553(a) factors — departures "refer[] only to non-[g]uidelines sentences imposed under the framework set out in the

explain it — identifying the main factors that drove it.  See, e.g., Rivera-Berríos, 968 F.3d at 134.  And if the judge gives a variant sentence, he or she must offer a more thorough justification:  "the greater the deviation," our cases say, "the greater the burden of justifying the sentence imposed."  United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016).

## II

Now back to Flores's situation.[6]

## A

Puerto Rico police agents obtained an arrest warrant for Flores on domestic violence and weapons charges.  Having heard that he would be at a local McDonald's, they stopped him after he went through the restaurant's drive-thru.  Arresting him, they found a Glock pistol altered to fire automatically, 63 rounds of ammunition, and a spent shell casing (among other items).  And this incident led to his being charged federally with unlawfully

---

[g]uidelines."  See Irizarry v. United States, 553 U.S. 708, 714 (2008).  Because departures play no role here, we leave it at that.

[6] Because this appeal follows a guilty plea, we pull the background information from the probation office's presentence report and the transcripts of the relevant court proceedings.  See, e.g., Rivera-Berríos, 968 F.3d at 132-33.

possessing a machine gun, to which he pled guilty.  See 18 U.S.C. § 922(o).

**B**

We skip straight to sentencing.  Adopting probation's presentence report, the judge (using the November 2018 edition of the guidelines) set Flores's base offense level at 20 for possessing the machine gun as a "prohibited person" because of his self-admitted drug use, see USSG § 2K2.1(a)(4)(B), but subtracted 3 levels because of his acceptance of responsibility, see USSG § 3E1.1(a) — for a total offense level of 17.  The judge then pegged Flores's criminal history category at I (the lowest category).  This left Flores with an advisory prison range of 24 to 30 months.

The defense requested 24 months.  The government proposed 30 months.  We will have lots to say later about the judge's sentence selection.  But for now we need only note the following points.  After directing the parties' attention to the "sentencing factors" in "[§] 3553(a)," the judge discussed how gun-related "crime in Puerto Rico far exceeds the known limits on the mainland" and how "[t]he impact of" Flores's "particular offense is more serious than that considered by the [s]entencing [c]ommission when it drafted the guidelines"; mentioned some biographical information (*e.g.*, Flores's earning a "GED"

certificate and his "history of using marijuana"); and recounted some details about the offense (*e.g.*, the police's confiscating the Glock, the 63 rounds of ammo, and the spent casing). Convinced that neither party's suggested sentence "reflects the seriousness of the offense, promotes respect for the law, protects the public from further crimes by . . . Flores," or "address[es] the issues of deterrence and punishment," the judge then imposed a variant sentence of 48 months — 18 months more than the top of the recommended sentencing range.

The "Statement of Reasons" form — which sentencing judges complete under 18 U.S.C. § 3553(c)(2) — included the judge's comment that "the impact of this [kind of weapon] on the Island is more serious tha[n] that considered by the [s]entencing [c]ommission."[7] And under the heading "**18 U.S.C. § 3553(a) and**

---

[7] Section 3553(c)(2) pertinently says that judges picking sentences "outside the [guidelines] range" must provide the reasons for the picks "with specificity in a statement of reasons form." The sentencing commission uses the information in these documents "to make recommendations to Congress." See United States v. Morales-Negrón, 974 F.3d 63, 68 (1st Cir. 2020). See generally United States v. Murchison, 865 F.3d 23, 26 (1st Cir. 2017) (noting that the bureau of prisons also uses this data to "classif[y] and process[] sentenced offenders"). A standing order of the district court provides that probation shall fill out these forms based on the judges' in-court comments and send them to the judges for final approval, see Morales-Negrón, 974 F.3d at 68 — apparently as a way to "streamline" the process, see Standing Order No. 17-205 (Apr. 28, 2017) (adding as well that judges "shall" give the parties sealed copies of these documents on request).

**other reason(s) for a variance (*Check all that apply*),**" three boxes were checked: to protect the public, to deter others from copying the crime, and to reflect how serious the crime was. Among the boxes left unchecked was one labeled "Policy Disagreement with the Guidelines (*Kimbrough v. U.S.*, 552 U.S. 85 (2007)."[8]

From this sentence Flores appeals.

### III

Of the many arguments Flores makes, only a couple require discussion. We begin with a losing contention and end with a winning one.

### A

### 1

Flores insists that the judge procedurally erred with the prohibited-person finding. As he correctly notes, a prohibited person in this context is someone "who engages in . . . regular use" of drugs "over a long period . . . proximate to or contemporaneous with the possession of the firearm." See United States v. Caparotta, 676 F.3d 213, 216 (1st Cir. 2012) (quotation marks omitted). Focusing on the "long period" language, he

---

[8] Granting Flores's request for access to the statement of reasons, the judge's electronic order says that "the transcript of the sentencing hearing is the official document and sets forth the [c]ourt's reasoning for the sentence imposed." But the fact remains that the judge left the box blank, despite having had the opportunity to check it.

contends that because he admitted only to "a few months of drug use," his situation does not fit this definition. The government counters that the record readily supports the judge's finding.

**2**

The government has the better of the argument. During pretrial interviews, Flores — who was 19 when nabbed — copped to smoking 4 or 5 marijuana joints daily since he was 17 and to having smoked before his arrest. On the eve of sentencing, however, he claimed in a presentence interview that he only smoked regularly during the three months before his arrest. Probation suggested, at least implicitly, that Flores did this about-face only because he now realized that he could get a prohibited-person increase to his sentence. The judge accepted probation's position, thus triggering clear-error review.

It is seldom easy to establish clear error. See, e.g., United States v. Rivera-Carrasquillo, 933 F.3d 33, 42 (1st Cir. 2019), cert. denied, 140 S. Ct. 2691 (2020). So it is here. That is because even assuming — without granting — that using marijuana for three months is not enough for prohibited-person status and that the late-in-the-game comment about the three months of marijuana use turns on a plausible view of the record, we think the judge's view is not implausible given Flores's earlier admissions about toking daily for *years*. See United States v.

Marceau, 554 F.3d 24, 30-31 (1st Cir. 2009) (upholding a prohibited-person increase where, "even after [a] stay at a drug treatment facility," the defendant "was unable to remain drug-free" and where he admitted to "smok[ing] marijuana daily in the days before" his crime). And if "there is more than one plausible view of the circumstances, the [judge's] choice among supportable alternatives cannot be clearly erroneous." See United States v. Dunston, 851 F.3d 91, 101-02 (1st Cir. 2017) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990)).

**B**

**1**

We move then to Flores's next claim of procedural error, which is that in saying the § 3553(a) factors justified the upward variance, the judge gave too much weight to the prevalence of gun violence in Puerto Rico and failed to custom tailor the sentence. In support, he points to the judge's repeated reference to guns in Puerto Rico — highlighting some of the following statements (we mentioned a couple already), all pulled from a section of the sentencing transcript where the judge brought up § 3553(a):

- "[C]rime in Puerto Rico far exceeds the known limits on the mainland. Even the [First] Circuit . . . has recognized that."

- "Violent crime and murders are occurring at all hours of the day, in any place on the island, even on congested public highways, in shopping centers, public basketball courts, and at cultural events."

- 11 -

- "Machine guns, like the one . . . Flores possessed in this case, are present everywhere, obtained by persons, like . . . Flores, who have had no training in the proper use of weapons and who appear not to have the means to purchase them."

- "The [First Circuit] has stated that a District Court may take into consideration, for sentencing purposes, the community and geographic factors where the offense took place.  In this District, for this type of weapon crime, the community that the [c]ourt takes into consideration is the entire island of Puerto Rico because weapons crimes are not limited to one particular area or region of the Commonwealth."

- "The impact in Puerto Rico of this particular offense is more serious than that considered by the [s]entencing [c]ommission when it drafted the guidelines."

- "Deterrence is an important factor in the sentencing calculus, and [§] 3553(a) requires the [c]ourt to consider preventing criminal behavior by the population at large, not just by the defendant being sentenced."

- "The [c]ourt does not purport to establish that . . . Flores'[s] crime itself was more harmful than others similar to his, but that his crime falls within a category of offenses, gun crimes, that the [c]ourt, considering the particular situation in Puerto Rico, views as more serious here than if they had occurred in a less violent society."

- "A modern machine gun can fire more than a thousand rounds per minute which allows a shooter to kill dozens of people within a matter of seconds."

- "A machine gun is unusual.  And outside of a few [g]overnment-related uses, machine guns largely exist on the black market."

Flores then talks up Rivera-Berríos (the district judge there and the one here are the same, by the way).  Rivera-Berríos held that the judge's concerns about machine guns "are universal in their application" and already worked "into the mix when the [s]entencing

- 12 -

[c]ommission set the base offense level," and that he focused too much on the community and too little on the individual in trying to explain why the defendant's situation differed from the usual case covered by the guidelines (a deeper dive into <u>Rivera-Berríos</u> is coming). <u>See</u> 968 F.3d at 136-37. Putting all this together, Flores contends that because the guidelines already accounted for the factor his judge depended on (that the crime involved a machine gun) and because the record lacks any basis for giving that factor added weight, we must vacate his sentence.

Trying to shift the focus of the debate, the government principally argues that the judge varied from the guidelines because he disagreed with them on policy grounds — something (we repeat) the Supreme Court has said district judges can do. <u>See, e.g.</u>, <u>Kimbrough</u>, 552 U.S. at 109-11. This phenomenon — a variance based on a categorical policy disagreement with the sentencing commission, rather than on a case-specific assessment of the § 3553(a) factors — is known as a "<u>Kimbrough</u> variance." <u>See</u> <u>United States</u> v. <u>Santiago-Colon</u>, 918 F.3d 223, 227 (1st Cir. 2019) (quoting <u>Stone</u>, 575 F.3d at 93). To bolster its theory, the government spotlights the judge's statements that "[t]he impact in Puerto Rico of this particular offense is more serious than that considered by the [s]entencing [c]ommission when it drafted the guidelines" and that "the particular situation in Puerto Rico" is

- 13 -

"more serious" than if the offense "had occurred in a less violent society."  Wrapping up, the government writes that because Rivera-Berríos did not involve a Kimbrough variance, we must "reject Flores's outsized reliance on that case."

**2**[9]

The government's argument touches on an interesting issue.  To resay (for convenience), district judges can discretionally vary sentences in two ways:  by *categorically* disagreeing with the suggested guidelines range — *i.e.*, by balking on a basis applicable to *all* defendants, "Eagle Scout[s]" and "street thug[s]" alike (for example);[10] or by making an *individualized* appraisal of the § 3553(a) factors — *i.e.*, by considering the *particular* characteristics of the defendant and the *particular* offense conduct.  See generally Kimbrough, 552 U.S. at 108-10 (noting that judges can vary from the commission's recommendations categorically, as well as in particular cases); see also Spears, 555 U.S. at 264 (emphasizing that Kimbrough recognizes the "authority" that district judges have "to vary from the [at-issue guidelines] based on *policy* disagreement with them, and not simply based on an individualized determination that they

---

[9] As a heads up, Chief Judge Barron does not join this section, III.B.2.

[10] See United States v. Gully, 619 F. Supp. 2d 633, 643 (N.D. Iowa 2009).

yield an excessive sentence in a particular case").  But judges too often "blend" these "different types of variances together," see Scott Michelman & Jay Rorty, *Doing* Kimbrough *Justice: Implementing Policy Disagreements with the Federal Sentencing Guidelines*, 45 Suffolk U. L. Rev. 1083, 1084 (2012), "masking their categorical policy disagreements as 'individualized determinations,'" to quote the Supreme Court — a routine condemned by the Court as "institutionalized subterfuge" (strong words, indeed), see Spears, 555 U.S. at 266.[11]  A possible reason for this blending might be that Supreme Court caselaw occasionally divides sentence selection into two steps:  calculating the advisory range (which lays the foundation for the sentence), then reviewing the § 3553(a) factors (some of which mention policy, *e.g.*, the need to consider the sentencing commission's "pertinent policy statement[s]"; others of which mention offender-based concerns, *e.g.*, the need to ponder the defendant's characteristics and history, plus the seriousness of the crime), see Gall v. United States, 552 U.S. 38, 49-50 (2007) — without explicitly including a step for Kimbrough variances.  See *Doing* Kimbrough *Justice*, 45 Suffolk U. L. Rev. at 1087, 1097-1101.

---

[11] For simplicity's sake, the remainder of the opinion will refer to the just-cited article — a studied and thoughtful treatment of the subject, penned by authors who live and breathe these issues — as "*Doing* Kimbrough *Justice*."

But whatever the reason (or reasons), the problems caused by blending discretionary variances cannot be exaggerated. Blending makes it harder for district judges "to exercise fully each type of discretion available" under modern sentencing practices (for example), see id. at 1084 — in other words, when judges apply "policy . . . and individualized considerations" at the same time, a defendant gets "only one" shot at "a variance, and so all of the factors may be thrown together in a way that does not allow full expression of each," see id. at 1112. Also, and as previously noted, judges must adequately explain why they chose a sentence to promote "meaningful appellate review" and "the perception of fair sentencing." See Gall, 552 U.S. at 50. Blending masks the judges' sentencing reasoning (as we just said), thus frustrating these all-important reviewability and fairness goals. See *Doing* Kimbrough *Justice*, 45 Suffolk U. L. Rev. at 1108-09. Critically too, because judges must take the guidelines "into account when sentencing," see United States v. Booker, 543 U.S. 220, 264 (2005), the sentencing commission continually updates them to "encourag[e] . . . better sentencing practices" and "uniformity in the sentencing process," see id. at 263; see also Kimbrough, 552 U.S. at 108 (emphasizing that "Congress established the [c]ommission to formulate and constantly refine national sentencing standards"). And the commission does this by reviewing

"empirical" data reflecting the combined experiences of judges across the country. See Rita v. United States, 551 U.S. 338, 349-50 (2007); see also Neal v. United States, 516 U.S. 284, 291 (1996) (emphasizing that "Congress . . . charged the [c]ommission with the duty to measure and monitor the effectiveness of various sentencing, penal, and correctional practices"). But masking the "grounds for [a] variance" (unsurprisingly) keeps "vital information" from the sentencing commission "about how the [g]uidelines can be improved." See *Doing* Kimbrough *Justice*, 45 Suffolk U. L. Rev. at 1084.

Consider this example of how a "large-scale sentencing reform[] gr[e]w organically from seeds sown by the district courts." See id. at 1109. The guidelines once had a 100-to-1 ratio for crack to powder cocaine — meaning the guidelines treated each gram of crack as 100 grams of powder cocaine. See Kimbrough, 552 U.S. at 91. Kimbrough said that district judges can drop below the guidelines in crack cases (provided they do not drop below a statutory minimum sentence) based on a policy beef with the crack/powder ratio. See id. at 102-11. Judges and the sentencing commission have "discrete institutional strengths," Kimbrough explained. Id. at 109. Judges better know the particular defendants before them "than the [c]ommission or the appeals court[s]" and so are better positioned to apply the § 3553(a)

factors "in each particular case." Id. (quoting Rita, 551 U.S. at 357-58). The sentencing commission's expertise is mainly "empirical," having as it does the knowledge, experience, and workforce to make estimates about the reasonable punishment ranges for the at-issue crimes. See id. (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). And these differences affect the degree of respect due a judge's decision to vary: in cases "outside" the guidelines's "heartland," decisions to vary "may attract greatest respect" — but in "mine-run" cases, Kimbrough noted, "closer review" may be necessary if the judge varies "based solely on" a policy disagreement with the guidelines. See id. Importantly too, though, when the sentencing commission settles on a policy choice for reasons beyond its expertise, the resulting guideline may be attacked on that basis. See id. That is precisely what happened in Kimbrough, where the crack/powder ratio did not reflect the commission's usual method of relying on "empirical data and national experience," see id. — the commission had cribbed the ratio from an inapplicable statute and so the ratio could not even be ascribed to Congress, see id. at 102-03, 109.

After Kimbrough, some judges chose to vary from the crack guidelines for policy reasons. See generally Spears, 555 U.S. at 264-66 (upholding a district judge's categorical policy

- 18 -

disagreement with the 100-to-1 ratio and use of a substitute 20-to-1 ratio). And their objections — *e.g.*, that this ratio had racially discriminatory effects — helped bring about statutory and guidelines changes. See *Doing* Kimbrough *Justice*, 45 Suffolk U. L. Rev. at 1109-10. But had they "kept their concerns about the fairness of [the crack/powder ratio] swaddled in the language of individual offender characteristics, a powerful and empirically based voice for reform would have been muted and the momentum for [these changes] might not have materialized." See id. at 1110. See generally Rita, 551 U.S. at 358 (noting a judge's explanation "can provide relevant information to both the court of appeals and ultimately to the [s]entencing [c]ommission," which will aid appellate review and will "help the [g]uidelines constructively evolve over time").

With that in mind, and as a general antidote to masking, some judges and criminal-law experts propose "separat[ing] the two types of variances" into distinct steps where appropriate (more on that next): after calculating the advisory guidelines range, judges would recalculate it based on any Kimbrough policy variance and then (using the recalculated range, if any there be) decide whether to vary up or down based on a case-specific analysis of the § 3553(a) factors. See *Doing* Kimbrough *Justice*, 45 Suffolk U. L. Rev. at 1108.

The point to decide up front is whether the judge varied based on a Kimbrough-sanctioned objection to the guidelines categorically. Again, the government says the judge did; Flores says the judge did not. The government's basic position boils down to this syllogism: (1) Judges varying from a commission-suggested range based solely on a community characteristic of the crime's locale are exercising their authority to disagree with the range itself. (2) Kimbrough says that judges can disagree with the commission (but not with a statute, and they must act reasonably in using that power). (3) Therefore, Kimbrough means — contrary to Rivera-Berríos — that judges can vary based solely on a community characteristic of the crime's locale (subject to the caveats listed in the preceding parenthetical).[12] We, like Flores, are unconvinced.

To be fair, a recent case of ours dropped a footnote suggesting the possibility that a variant sentence driven solely by this kind of community characteristic might be a Kimbrough

---

[12] For what it is worth, the government insists that the judge made a Kimbrough variance even though (as we said above) the judge left the "Policy Disagreement with the Guidelines (*Kimbrough v. U.S.*, 552 U.S. 85 (2007)" box blank on the written statement of reasons.

variance.  See United States v. Carrasquillo-Sánchez, 9 F.4th 56, 61 n.2 (1st Cir. 2021).  But the answer to that suggestion is no.

Concerned about disparate sentences on like facts under the old regime, Congress tasked the sentencing commission with "establish[ing] sentencing *policies* for the Federal criminal justice *system*."  See 28 U.S.C. § 991(b)(1) (emphases added).  The commission knows that any actual crime will be committed only in a particular place, at a particular time, in a particular way, and by a particular offender with a particular background.  But a commission-endorsed range for a crime is generally meant to apply in any *case* involving that crime.  See Rita, 551 U.S. at 350 (stating that "it is fair to assume that the [g]uidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives").  Which is why the sentencing commission expects judges "to treat each guideline as carving out a 'heartland,' a set of *typical cases* embodying the conduct that each guideline describes," see USSG Ch. 1 Pt. A, introductory cmt. 4(b) (emphasis added) — to view the guidelines as a judgment about the mine-run way of committing the crime, not as a judgment about the right range for every case.  Cf. United States v. Aguilar-Peña, 887 F.2d 347, 351 (1st Cir. 1989) (noting that "[b]ecause the grounds for departure derived their essence from the offense itself, not from [idiosyncratic] circumstances

- 21 -

attendant to a particular defendant's commission of a particular crime, the grounds, virtually by definition, fell within the heartland").

So a sentence that varies from a commission-proposed range based solely on a community characteristic of the crime's locale does not reflect any disagreement with the commission's policy-based reasons for setting the range itself. It merely reflects a decision that the case at hand is not mine-run and thus is not the kind of case for which that baseline range was set. Otherwise, one could describe *any* variant sentence as resting on an exercise of authority under Kimbrough.

Nor do we see how a judge using Kimbrough can highlight a guideline's nationwide focus as the sole reason for not employing the guidelines as a starting point for applying the § 3553(a) factors to the specific case at hand — especially given our long-held view "that the birth of the Sentencing Commission was to some extent reflective of Congress's ardent desire to dispense with inequalities based on localized sentencing responses." See Aguilar-Peña, 887 F.2d at 352; see also 28 U.S.C. § 991(b)(1)(B).

The net result is that the government is mistaken in thinking that a judge can avoid Rivera-Berríos's precedential reach simply by invoking the authority that Kimbrough blesses to

reject a guideline on policy grounds.  To us, the authority to vary a sentence that each of those cases addresses is simply too distinct for that to be so.[13]  And Rivera-Berríos makes clear that judges act arbitrarily and capriciously by varying upward from the advisory range based solely on the characteristics of the broader community where the defendant's conduct took place.

**4**

Drawing on long-standing precedent, Rivera-Berríos (as we hinted above) held that when judges "rel[y] on" a § 3553(a)

---

[13] In a post-briefing letter, see Fed. R. App. P. 28(j), the government writes that "to the extent Flores" believes that the judge "could not vary based on a policy disagreement with the [g]uidelines," United States v. Politano, 522 F.3d 69 (1st Cir. 2008) — which, the letter adds, "cit[es]" Kimbrough — holds that he could.  This is because, in the government's view, the Politano judge made a Kimbrough variance when he remarked, "I think any reader of the daily newspapers is aware that the illegal trafficking of firearms at the street level is a significant contributing factor in what, without exaggeration I think, can be called an epidemic of handgun violence in communities within th[e] district" of Massachusetts.  The argument does not persuade us, however.  The district court there did *not* base the upwardly variant 24-month sentence (which exceeded the top end of the range by 6 months) solely on community characteristics.  Actually, in mentioning the community characteristics, the district court did not say that they supported an upward variance *in any amount*. Instead, the district court simply said that they showed the defendant did a very serious crime, requiring a correspondingly serious sentence.  And then the district court pinpointed another aggravating circumstance — "the likelihood of recidivism" that the "[g]uidelines somewhat underestimate[d] or undercount[ed]" in that defendant's case.  552 F.3d at 74.  So ultimately we read Politano as rejecting the same theory that Flores-Machicote rejected — that a sentencer cannot consider community characteristics *at all* (more about Flores-Machicote shortly).

consideration "already accounted for by the . . . guidelines to impose a variant sentence," they "must indicate what makes that factor worthy of extra weight," see 968 F.3d at 136 (quotation marks omitted) — *i.e.*, they "must articulate specifically the reasons" why the "defendant's situation is different from the ordinary situation covered by the guidelines calculation," see United States v. García-Pérez, 9 F.4th 48, 53 (1st Cir. 2021) (quotation marks omitted).[14]  The factor the Rivera-Berríos judge relied on — that the crime involved a machine gun — was already figured into the "guideline[s] calculus."  See 968 F.3d at 136. "And," Rivera-Berríos added, "the record" lacked "any basis for giving that factor extra weight."  Id.  The judge there did emphasize crime trends in Puerto Rico.  But he did not — as the

_____

[14] By way of another after-briefing missive, the government claims that the "different from the ordinary situation covered by the guidelines calculation" requirement clashes with Supreme Court precedent — including Gall, which rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the [g]uidelines range."  See 552 U.S. at 47.  We question whether this letter relates to any previously briefed issue in this case (the government does not direct us to "the page of the brief," as 28(j) commands).  See Hernandez Lara v. Barr, 962 F.3d 45, 52 n.10 (1st Cir. 2020) (stating that a party cannot use the 28(j) process "to introduce new arguments that [it] failed to raise in its brief").  And even if we resolved our doubts in the government's favor, the government articulates no theory for how we as a panel can undo that oft-repeated requirement (repeated, by the way, in cases that also cite Gall (for example)).  See, e.g., Carrasquillo-Sánchez, 9 F.4th at 59.  Either way, the government's claim is not a difference-maker here.

- 24 -

caselaw requires — specifically tie this concern to "the nature of the defendant's conduct beyond his possession of a machinegun." See Carrasquillo-Sánchez, 9 F.4th at 61 (discussing Rivera-Berríos); see also García-Pérez, 9 F.4th at 53-54 (ditto).

We can match up some of the key words the judge used at Rivera-Berríos's sentencing and Flores's, almost precisely (remember the same judge sentenced both men) — for instance (a few alterations added; others in original):

| Rivera-Berríos's Sentencing | Flores's Sentencing |
| --- | --- |
| "A modern gun can fire more than one thousand round[s] a[] minute allowing a shooter to kill dozens of people within a matter of seconds." | "A modern machine gun can fire more than a thousand rounds per minute which allows a shooter to kill dozens of people within a matter of seconds." |
| "[M]achine guns largely exist on the black market." | "[M]achine guns largely exist on the black market." |
| "[V]iolent crimes and murders are occurring at all hours of the day in Puerto Rico, in any place on the island, even on congested public highways, in shopping centers, public basketball courts, and at cultural centers." | "Violent crime and murders are occurring at all hours of the day, in any place on the island, even on congested public highways, in shopping centers, public basketball courts, and at cultural events." |

As for the concerns expressed in the first two boxes (involving the lethality and illegality of machine guns generally), the guidelines already capture them. See, e.g.,

Carrasquillo-Sánchez, 9 F.4th at 59; Rivera-Berríos, 968 F.3d at 136. And as for the concerns expressed in the third box (involving the frequency of machine-gun violence in Puerto Rico), while they "may be relevant at sentencing," the judge still had to consider Flores's individual circumstances — *i.e.*, he still had to make a "case-specific nexus" between the community-based characteristics and the circumstances of Flores's situation beyond his machine-gun possession. See Rivera-Berríos, 968 F.3d at 136. But this the judge failed to do.

Despite the government's claim that the judge "conduct[ed] an individualized assessment of Flores's personal characteristics and the details of his offense," nothing in the judge's brief synopsis of those points — including the amount of ammo recovered, plus the spent casing — shows that the judge relied on them in varying so drastically from the suggested prison range. Said otherwise, to borrow from Carrasquillo-Sánchez, "[t]here is no sense in which the [judge], by considering" specific personal factors, "was offering an individualized basis for the upward variance that [she] imposed." See 9 F.4th at 60.

Citing to the presentence report, the government plays up how agents arrested Flores after he went through a McDonald's drive-thru with the Glock. But the judge did not mention this fact in explaining his chosen sentence. And to borrow again from

Carrasquillo-Sánchez, even though the presentence report referenced "certain facts," they could not "be used to supplement the [judge's] explanation" because "nothing in the [judge's] summary of the facts and weighing of the sentencing factors indicates that [he] relied on" them for the "variant sentence." See id. at 62; see also García-Pérez, 9 F.4th at 55 (making a similar point in a similar situation).

While admittedly the judge did say that the sentence had to reflect the crime's seriousness, promote respect for the law, and provide adequate deterrence and public protection, "[t]hese concerns" are too "generic:  they apply to any defendant in any machine gun possession case."  See Rivera-Berríos, 968 F.3d at 137.  In coming up with the upward variance, the judge — as we keep saying — had to link these interests to Flores's circumstances and behavior independent of his mere machine-gun possession.  See id.  But we know the judge did not because (and here is the clincher) he (as the government admits) said that "[t]he [c]ourt does not purport to establish that . . . Flores'[s] crime itself was more harmful than others similar to his" — meaning that (other than the community characteristic) "the nature" of Flores's "firearm" provided "the driving force behind the upward variance." See id. at 135.  The government tries to explain away the judge's comment by arguing that he said it while making a Kimbrough-style

policy disagreement.    But our rejection of the government's Kimbrough theory makes this argument a nonstarter too.

The government's brief might be read as suggesting that Rivera-Berríos conflicts with our earlier decision in Flores-Machicote, thus requiring us to follow Flores-Machicote.  If so, the government is wrong.

Flores-Machicote rejected a defendant's categorical claim that a sentencing judge could not consider a community-based characteristic of the offense, namely, "the incidence and trend lines of particular types of crime in the affected community."  Id. at 23.  Such a characteristic, we explained, may "appropriately inform[] and contextualize[] the relevant need for deterrence," id. — a consideration made relevant by § 3553(a)(2)(B).  But Flores-Machicote did not address how much weight a judge could give to that kind of characteristic in making a variant sentence.  And that is probably because the defendant there did not ask us to address that question:  again, he argued categorically that a community-based characteristic of the crime could not be considered *at all* under § 3553(a) and so could not be given any weight seemingly for any purpose, including even presumably in setting a within-guidelines sentence.

Rivera-Berríos, however, gave us a chance to address whether sentencers can rely *exclusively* on community

characteristics in varying upward from the guidelines. See 968 F.3d at 136 (declaring that "even though such community characteristics may be relevant at sentencing," district judges must still tie their sentencing decisions to "'individual factors related to the offender and the offense'" (quoting United States v. Rivera-González, 776 F.3d 45, 50 (1st Cir. 2015), plus relying on Flores-Machicote as well)). And faced with that question, we — after saying that this characteristic could be *a* factor — answered with an emphatic no. See id.[15]

The bottom line is that Rivera-Berríos does not clash with Flores-Machicote.[16]

---

[15] Our concurring colleague claims that our vacating Flores's sentence conflicts with decisions from "at least two of our sister circuits." His critique is true only if our decision clashes with Flores-Machicote (his unstated premise is Flores-Machicote's analysis mirrors the analysis in the sibling-circuit cases). But because we see no conflict between Flores-Machicote and this case, we disagree with our friend's circuit-split charge.

[16] Paraphrasing this part of our opinion as saying "that community-based considerations calling for greater deterrence can only be relied on in combination with other factors," our concurring co-panelist then seemingly suggests he thinks our take is explanation-free or made up. But our citing and quoting circuit caselaw shows otherwise. We note too that Flores-Machicote itself recognized "that a sentencing court's emphasis on factors that are specifically tied to either the offender or the offense of conviction — say, the perceived shortcomings of local courts or the incidence of particular crimes in a given locale — may . . . go too far." See 706 F.3d at 23 (adding that "[a] sentencing judge's resort to community-based characteristics does not relieve him or her of the obligation to ground sentencing determinations in case-specific factors" (citing Politano, 522 F.3d at 74)). And today's case is a case of a sentencer going too far, given Rivera-

To continue quoting Rivera-Berríos — and as a matter of helpful repetition as we bring this opinion to a close — when, as here, neither the judge nor the record identifies a "special characteristic attributable either to the offender" or the circumstances of "the offense" that "remove[s]" the "case from the mine-run," the "upwardly variant sentence cannot endure." See 968 F.3d at 137. Having so ruled — after spying no error with the judge's prohibited-person finding — we need not tackle Flores's other sentencing challenges (including, for example, his substantive-unreasonableness claim). See, e.g., Carrasquillo-Sánchez, 9 F.4th at 62; Rivera-Berríos, 968 F.3d at 137. And taking our cue from Rivera-Berríos, we vacate the contested

---

Berríos (authored by the same judge who authored Flores-Machicote): Just as in Rivera-Berríos, because the judge considered Puerto Rico's high rate of gun violence "unmoored from any individual characteristics of either the offender or the offense of conviction," his community-based concerns "cannot serve as building blocks for an upward variance," see 968 F.3d at 137 (citing Flores-Machicote, 706 F.3d at 21); accord Carrasquillo-Sánchez, 9 F.4th at 61. And as our colleague acknowledges, Rivera-Berríos and Carrasquillo-Sánchez compel the result reached by us.

sentence and remand for resentencing within the advisory prison range of 24 to 30 months.  See 968 F.3d at 137.


**- CONCURRING OPINION FOLLOWS -**

**KAYATTA**, <u>Circuit Judge</u>, **concurring.** Flores possessed a machine gun. In that sense, he was the "mine-run" defendant charged under 18 U.S.C. § 922(o) with possessing such a firearm. Flores, however, possessed that machine gun in a community rationally viewed by the sentencing judge as atypically plagued by machine-gun carnage. In that sense, he was not the mine-run individual charged under section 922(o).

We have previously said that "a sentencing judge may consider community-based and geographic factors" because "the incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence." <u>United States</u> v. <u>Flores-Machicote</u>, 706 F.3d 16, 22–23 (1st Cir. 2013). Although we cautioned that a sentencing judge "may not go too far" in emphasizing factors not specifically tied to the given offender or offense, <u>id.</u> at 24, we nevertheless upheld an upwardly variant sentence of 60 months (19 months over the high end of the range recommended by the Guidelines). In so doing, we expressly held that "it is permissible for a sentencing court to consider the incidence and trend lines of particular types of crimes in the affected community." <u>Id.</u> at 23. Accordingly, if "violent crime is running rampant" in a particular community, a "judge reasonably may conclude that the need for deterrence is great -- and this may translate into a stiffer sentence." <u>Id.</u>

Here, with the district court's explanation of the community's need for added deterrence at least as developed as that in Flores-Machicote, we nevertheless vacate a variant sentence of 48 months (18 months over the high end of the range recommended by the Guidelines). In so doing, we effectively part company with our past decision in Flores-Machicote and with decisions of at least two of our sister circuits. See United States v. Cavera, 550 F.3d 180, 195-96 (2d Cir. 2008) (en banc) (holding that locality-based factors, such as the severity of local gun control laws and its impact on the profitability of the black market for illegal firearms, can justify an upward variance from the Guidelines); United States v. Hatch, 909 F.3d 872, 874-75 (7th Cir. 2018) (citing Cavera and Flores-Machicote to hold that a sentencing judge may consider community-specific factors, such as an increase in local gun violence and the need to deter illegal gun trafficking, when imposing an upward variance).

How did we get to this point? The answer resides in two intervening decisions. The first is United States v. Rivera-Berríos, 968 F.3d 130 (1st Cir. 2020). In that case, we claimed to follow Flores-Machicote by acknowledging that "community characteristics may be relevant at sentencing." Id. at 136. But then -- even though the defendant there (unlike the mine-run defendant) possessed a machine gun in a community the sentencing

judge perceived as beset by violence, id. at 135 -- we concluded that there was no "case-specific nexus" between those community-based considerations and the individual defendant or offense. Id. at 136-37.

Next came our decision in United States v. Carrasquillo-Sánchez. See 9 F.4th 56 (1st Cir. 2021). There, the district court explained that Puerto Rico was "in a state of siege" due to machine-gun possession, and it pointed to nine examples of recent machine-gun shootings from the preceding months. Id. at 61. With Rivera-Berríos in the driver's seat, we left Flores-Machicote in the dust by declaring this community-based concern "unmoored" from the defendant's individual characteristics, and even from the offense. Id. (quoting Rivera-Berríos, 968 F.3d at 137). In short, we deemed the possession of a machine gun in Puerto Rico, without more, to be the mine-run machine-gun possession case, even in the face of the district court's apparently uncontested assertion that machine-gun possession posed a greater problem there than elsewhere.

That leads us to today's decision, where we now for a third time reject a district court's attempt to vary upward based on the conditions in Puerto Rico. The majority opinion suggests that our more recent precedent can be reconciled with Flores-Machicote (and thus with the decisions of our sister circuits).

But it is difficult to see how.  Flores-Machicote gave a full-throated endorsement for the ability to enhance a sentence when the sentencing judge concludes that "violent crime is running rampant" in a particular community, 706 F.3d at 23, while Rivera-Berríos and Carrasquillo-Sánchez held that a judge cannot rely on that perceived need for greater deterrence to justify an upwardly variant sentence.  The majority tries to explain away the tension between these precedents by reasoning that community-based considerations calling for greater deterrence can only be relied on in combination with other factors.  The majority does not explain how a factor can add months to a sentence when added to other factors that themselves support an enhancement, yet support no enhancement at all on its own.  And while the majority suggests that it is simply holding that the variance went "too far," its explanation of its holding makes clear that any upward variance based solely on community characteristics is too far.[17]  Maj. Op. at 29 n.16.  Simply put, any straightforward comparison of page 23 of our opinion in Flores-Machicote with the holding in this case

_____

[17]  Hence, the majority does not attempt to explain why the 19-month variance over the Guideline range in Flores-Machicote was not too far, yet the 18-month variance over the Guideline range in this case is too far.  Nor does it attempt to explain what variance would not be too far.

- 35 -

makes clear that our circuit has flip-flopped along the way, and we have likely landed wrong side up.

The end result seems hard to square with real-world scenarios. Consider, for instance, a defendant who unlawfully possesses a machine gun in a densely populated neighborhood in Boston compared with a defendant who possesses a machine gun in a rural town in Western Massachusetts. Presumably, a sentencing judge could vary upward in the first context because the possession of a machine gun in a crowded city presents dangers that would not otherwise be accounted for in the mine-run circumstance. But if that is true, it is not clear why a defendant's unlawful possession of a machine gun in a community the sentencing judge views as atypically impacted by the specific offense would not also present a case that is distinct from the mine-run case. Cf. United States v. Politano, 522 F.3d 69, 72-74 (1st Cir. 2008) (approving a district court's variance based on its conclusion that "community-specific characteristics in the District of Massachusetts," including a perceived "epidemic of handgun violence," made "the impact of [firearms trafficking] . . . more serious than that reflected by the Sentencing Commission").

The majority is even unclear about how it views the community-based considerations present in this case. At one point, the majority explains that a variant sentence "based solely on a

community characteristic of the crime's locale . . . merely reflects a decision that the case at hand is not mine-run." Maj. Op. at 22. And yet, later on, the majority admonishes the sentencing judge for not "link[ing] [the community-based] interests to Flores's circumstances and behavior" in a way that takes this out of the mine-run of gun-possession cases. Maj. Op. at 27. In essence, the majority seems to conclude that the district court's community-based rationale was too case-specific to be justified as a policy disagreement with the Guidelines under Kimbrough v. United States, 552 U.S. 85 (2007), yet too unmoored from the specific case to justify a variance in accord with section 3553(a).

As a result, my colleagues have effectively deprived district judges of the ability to align sentences with the perceived level of crimes in their communities, and hence with the requisite need for deterrence. And because the Sentencing Commission pays no heed to such local variations, that leaves no one able to raise (or lower) sentences based on the needs of those who are most directly affected by the crimes at issue.

To me, this all points strongly toward the conclusion that Flores-Machicote was correct in holding that an increased need for deterrence in a given community should be able to justify a variant sentence, at least to some extent. And, as I read

section 3553(a), Congress has agreed by expressly calling for sentencing judges to consider (in addition to the Guideline range) "the need . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Given this direction, it is difficult to understand how our court can hold that a district court in Puerto Rico cannot conclude that a Guideline sentence adequate to deter machine-gun possession in Portland, Maine may not be adequate to do so in San Juan. And one can fairly ask, if there were a sharp increase of high-profile machine gun shootings in Boston, would we really say that district judges could not under section 3553(a) decide that an increased need for deterrence called for stiffer sentences in machine-gun possession cases in Boston?

That said, I must agree that our most recent precedent under Rivera-Berríos and Carrasquillo-Sánchez precludes us from affirming what would otherwise seem to be a properly justified upward variance aimed at deterring an offense more serious than the mine-run version precisely because of the increased threats faced by the community in which it occurred. Whether that most recent precedent need itself be revisited is a question to be addressed after this panel's opinion is issued.